IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| REYCE ANDRE LEVON COLLINS,      ) | |
|     Plaintiff,                                       ) | Civil Action No. 7:22-cv-00406 |
| v.                                                               ) | |
|                                                           ) | By:  Elizabeth K. Dillon |
| HAROLD CLARKE, *et al.*,                   ) |      United States District Judge |
|     Defendants.                                 ) | |

**MEMORANDUM OPINION**

Plaintiff Reyce Andre Levon Collins, a prisoner in the custody of the Virginia Department of Corrections (VDOC) and proceeding *pro se*, filed this action pursuant to 42 U.S.C. § 1983. Collins's complaint names six defendants. Four of them—defendants Davis, Sturman, Hicks, and Heffinger—have filed an answer and indicated that they do not intend to file a motion for summary judgment. The claims against them have been set for trial. The other two defendants—Harold Clarke (VDOC's Director) and Kevin Punturi (the Warden at Pocahontas State Correctional Center (PSCC) at all relevant times)—have filed a motion to dismiss. The motion is fully briefed and ripe for disposition. Because Collins has failed to allege adequate personal involvement by either of these defendants, the motion to dismiss will be granted and the claims against Clarke and Punturi will be dismissed.

I.  BACKGROUND

Collins's complaint alleges that, on August 23, 2021, after he got into a verbal dispute with Captain Sturman at PSCC, he was escorted to the Restorative Housing Unit (RHU) in handcuffs. Once there and while he was being restrained by two officers, he was physically assaulted by Davis. The assault included Davis's striking Collins in the face four times with a closed fist and choking Collins for approximately five seconds. (Compl. 3, 6, Dkt. No. 1.)

Collins was then locked in the shower for thirty minutes while still in handcuffs. He informed Sturman and Heffinger that he thought he had a concussion, but he was denied medical

treatment. Instead, he was sent back to his general population cell without any disciplinary charges. Once he was returned to his cell, Collins evaluated his injuries, which were a large knot to his forehead, noticeable bruising and swelling, and a laceration along the left side of his face. He also felt out-of-sorts and later vomited. He believed he may have suffered a concussion and asked again for medical treatment after the officers changed shifts. (*Id.* at 3.)

He was taken to medical by officers on the next shift and treated for a concussion. While there, he gave a statement of what had transpired and pictures were taken of his injuries. Because he had complained about a staff assault, he was led back to the RHU and placed "Under Investigation," which he says was VDOC policy. (*Id.* at 3–4.)

Three days later, on August 26, Collins was informed that his statement, the pictures of his injuries, and all relevant video had been handed over for an internal investigation. On September 9, the investigating agent informed him that there was no video footage of any assault, but noted that Collins was out of view of the camera for approximately two minutes. Also, five staff members had stated that no acts of violence occurred. Thus, Collins's claims were deemed unsubstantiated. (*Id.* at 4.) On September 14, Collins was told he would be returned to general population, but Collins "refused in fear for [his] safety." (*Id.*)

Because he chose not to re-enter the general population, he was "forced to remain" in the RHU, awaiting an institutional transfer.[1] While there, he was under "heavy restrictions," including a prohibition on ordering from the commissary, and a limitation to two phone calls per

---

[1] According to the complaint, Collins refused to leave the RHU because of concerns about his safety. But in his response to the motion to dismiss (and in his proposed amended complaint), Collins states that he believed if he remained in "protective custody," he would be transferred to a different correctional center, which he wanted. He thought if he agreed to return to general population that his request for a transfer would be deemed withdrawn. (Opp'n Mot. to Dismiss 3, Dkt. No. 19; *see also id.* ¶ 33, Dkt. No. 19, at 10 (as part of proposed amended complaint).)

month.  Throughout this time, he filed informal complaints and grievances, and he reached out to civil rights groups, state politicians, and unnamed "VDOC administrators," demanding a new investigation and requesting a polygraph examination.  On November 15, 2021, he was given a polygraph about the incident.  He was told he "passed" the test, and three days later, he was transferred to Green Rock Correctional Center, where he is now housed.  (*Id.* at 4–5.)

Collins's complaint also discusses the great toll his time in the RHU took on his mental health and his relationship with his young daughter.  He states that although he did nothing wrong, he was forced to spend 92 days in the RHU under restrictive conditions "just because [he] spoke out" about the assault.  (*Id.* at 5.)  He asks for compensatory and punitive damages and injunctive relief.  (*Id.* at 2.)

The allegations against defendants Clarke and Punturi are limited.  The complaint alleges that Clarke is "responsible for a policy that punishes victims of staff assault, by housing them in the Restorative Housing Unit, and placing unjust restrictions such as the loss of commissary and limiting phone calls to only two 20 minute calls a month."  (*Id.* at 6.)  As for Punturi, Collins states that he was "notified" of the assault, yet "I was kept in the RHU for 92 days without just cause."  (*Id.*)  Collins provides no details as to how Punturi was notified, by whom, or when.

In response to the motion to dismiss, Collins filed what he calls an "Answer," but which the court treats as his opposition.  Attached to that document is another document, which appears to be a proposed amended complaint.  Collins has not sought leave to amend, however.  If he wants to file the document that is currently part of Dkt. No. 19, at pages 5–16, as an amended complaint, either with or without the attached exhibits (Dkt. No. 19-1, at 1–63), he should file a motion for leave to amend, along with a copy of his proposed amended complaint.  The court, however, has considered—only as to defendants Clarke and Punturi—the additional allegations

3

against them in what appears to be the proposed amended complaint.[2]

The additional allegations against Punturi are that Collins, on November 6, 2021, less than two weeks before he was transferred, appealed the denial of his grievance to Punturi, but he did not receive a response. (Proposed Am. Compl. 13–14, Dkt. No. 19.) His proposed amended complaint also lists separately his legal claims. The sole claim naming Clarke and Punturi states:

> The placement of Plaintiff Collins in the Restorative Housing Unit at PSCC without due process, by Defendants Punturi and Clarke, shows a burden to Plaintiff Collins' liberty interest right under the Fourteenth Amendment of the United States Constitution.

(Proposed Am. Compl. ¶ 53, Dkt. No. 19 at 14.)[3]

II. DISCUSSION

A. Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss under Rule 12(b)(6) tests the complaint's legal and factual sufficiency. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677–80 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–63 (2007); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).[4] To withstand a Rule 12(b)(6) motion, a pleading must "contain sufficient factual matter, accepted as

---

[2] These defendants suffer no prejudice as a result. As discussed *infra*, even treating those allegations as part of the complaint, Collins still fails to allege sufficient personal involvement by either defendant.

[3] In his opposition, but not his proposed amended complaint, Collins includes some additional statements about Punturi and Clarke. But a plaintiff may not amend his complaint through briefing. *S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 18485 (4th Cir. 2013). Regardless, the additional allegations would not remedy the deficiencies in Collins's complaint.
In his briefing, Collins states that "[b]oth Clarke and Punturi were made aware of the allegations, by staff reports, Grievances and Complaints filed by [Collins], along with numerous letters, emails and phone calls to the [VDOC] Headquarters, made by the family of the plaintiff." (Opp'n to Mot. Dismiss 1–2, Dkt. No. 19.) The court has reviewed the sixty-three pages of documents Collins has submitted, which reflect a number of informal complaints, grievances, and letters to civil rights organizations, many of them duplicative of the exhibits to his original complaint. None of those documents are addressed to, or signed by, either Punturi or Clarke. (*See generally* Dkt. No. 19-1.) His grievance appeal appears to have been received by the regional ombudsman, but there is no indication it was forwarded to Punturi or otherwise made known to him.

[4] Unless otherwise noted, the court omits internal citations, alterations, and quotation marks throughout this opinion. *See United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678.  In considering the motion, the court must construe the facts and reasonable inferences "in the light most favorable to the nonmoving party." *Massey v. Ojaniit*, 759 F.3d 343, 347 (4th Cir. 2014).  But a court need not accept as true a complaint's legal conclusions, "unwarranted inferences, unreasonable conclusions, or arguments." *Giarratano*, 521 F.3d at 302.  *Pro se* complaints are afforded a liberal construction.  *Laber v. Harvey*, 438 F.3d 404, 413 n.3 (4th Cir. 2006).

**B.  Personal Involvement of Defendants**

Defendants Clarke and Punturi move to dismiss because Collins has failed to allege sufficient personal involvement by them in the alleged constitutional violations.  (*See generally* Mem. Supp. Mot. Dismiss, Dkt. No. 13.)  They also argue that his allegations related to the policy itself do not state a constitutional claim.[5]

"To state a claim under § 1983[,] a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Loftus v. Bobzien*, 848 F.3d 278, 284–85 (4th Cir. 2017).  Liability under § 1983 is "personal, based upon each defendant's own constitutional violations." *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).  Thus, a § 1983 claim requires factual detail about each defendant's personal involvement.  *See Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017) (explaining that liability will lie under § 1983 only "where it is affirmatively shown that the official charged acted personally" in the violation of plaintiff's rights and affirming dismissal of claim where plaintiff did not allege personal involvement by defendant) (quoting *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977)).

As noted, the allegations involving Clarke and Punturi were general and limited.  First,

---

[5] In light of its ruling, the court does not address their second argument.

5

the complaint alleges that Clarke was "responsible" for the policy that led to Collins being placed and held in the RHU.  Second, Collins alleges that he appealed his grievance to Punturi, but did not receive a response.  Additionally, although only in his briefing, *see supra* note 3, Collins alleges that both defendants were "made aware" of his complaints by unspecified documents, letters, calls, and emails from his family members, sent on unstated dates.

These allegations do not state a claim against Clarke or Punturi.  First of all, to the extent he is claiming personal involvement based on Clarke's creating a general policy that places inmates who make claims of staff assault in protective custody, that is insufficient to show a violation here.  Such a policy with a purpose of protecting inmates is undoubtedly a valid one, and Collins does not raise any facial challenge to the policy.  Indeed, Collins acknowledges that he was placed in the RHU—and chose to remain there—for his own safety, thereby recognizing the validity of the policy as a means of protecting inmates.  Also, Collins admits that he was permitted to return to general population after the investigation into his allegations deemed them unsubstantiated.  He refused and effectively made the decision to stay in protective custody.  Whatever his reasons for doing so, most of his time in the RHU was the result of his own choice.  It cannot be attributed in any way to Clarke or the policy of housing inmates in protective custody while an allegation of staff assault is investigated.  Further, Collins does not allege that Clarke even knew the policy was being applied to Collins.

Collins's other allegations also fail to include adequate *facts*—as opposed to a mere conclusion—to plausibly show that either Clarke or Punturi knew of his allegations of assault, his placement and retention in the RHU, or of his grievances.  He simply claims that his grievance directed toward Punturi went unanswered, and that he or family members complained to them.  He provides no specifics as to the dates of these complaints or letters, nor is there any indication in the numerous grievance documents and letters he has submitted that either of these

6

defendants was made aware of his assault or placement in the RHU. Thus, his allegations do not plausibly suggest that these supervisory officials were personally involved in the alleged denial of due process. *See Simonton v. Tennis*, 437 F. App'x 60, 62 (3d Cir. 2011) (explaining that "a prison official's secondary review of an inmate's grievance or appeal is not sufficient to demonstrate the requisite personal involvement"); *George v. Smith*, 507 F.3d 605, 609–10 (7th Cir. 2007) (reasoning that the fact that a prison official has knowledge of a completed constitutional violation, based on his participation in the grievance process, does not make that official personally liable, even if he denies the a grievance based on it); *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (holding that the receipt of two letters from an inmate complaining of alleged due process violations was insufficient to demonstrate the requisite personal involvement on the part of a prison administrator); *Wall v. Clarke*, No. 7:19-CV-00260, 2021 WL 5444754, at *7 (W.D. Va. Nov. 22, 2021) (holding that allegations that a plaintiff sent two letters to one prison officer detailing due process violations and that another denied his grievance about the violations did "not plausibly suggest that these supervisory officials were personally involved in the alleged denial of due process"), *reconsideration denied,* No. 7:19CV00260, 2023 WL 2702677 (W.D. Va. Mar. 29, 2023); *Ferguson v. Clarke*, No. 7:14cv00108, 2015 WL 1309966, at *2 (W.D. Va. Mar. 24, 2015) (finding no individual liability where plaintiff alleged that he and family members contacted Clarke, without any allegations that Clarke was involved in the alleged assaults or mistreatment and without any allegations that Clarke actually received or knew of calls or letters from the plaintiff or his family).

   The Fourth Circuit has explained that "[r]eceipt of letters by prison officials may be evidence of personal knowledge of unconstitutional conditions" and that such notice can "facilitate personal involvement in a deprivation of rights where the harm continues over a period of time." 766 F.2d at 850. Here, the only specific allegation as to Punturi—and one

7

unsupported by the grievance documents Collins attached to his complaint—is that he never responded to Collins's grievance appeal.  But Collins alleges that he sent the appeal on November 6, 2021.  Nine days later, he was given a polygraph about this incident, and on November 18, 2021, Collins was transferred to Green Rock.  (*Id.* at 4–5.)  Thus, at most Punturi was advised of Collins's complaints less than two weeks before he was transferred out of the RHU.[6]  Moreover, as noted, none of the grievance documents in the stack provided by Collins suggest that any were routed to Punturi or viewed by him.  This is distinct from the situation described in *Wright*, where the harm continued over a period of time after the defendant had been notified of an ongoing violation.

Collins's allegations also fail to state a viable claim of supervisory liability under the governing standard. *See Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) (setting forth required elements for a claim of supervisory liability) (citing *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).  To state such a claim, a plaintiff must allege facts sufficient to show:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices[;] and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotation marks omitted); *see also Slakan v. Porter*, 737 F.2d 368, 372-74 (4th Cir. 1984) (discussing the "heavy burden of proof"

---

[6] Significantly, moreover, Collins's log of notes about what occurred during the relevant time states that he was advised that a transfer had been requested for him by PSCC staff on October 16, before he ever appealed to Punturi. (Dkt. No. 1-1, at 17 (noting that on that date he "received [a] Doc-11 stating that [two PSCC personnel] both approved [his] transfer to [Green Rock]" and were waiting for an approval "by Richmond, so a 'transfer can be scheduled'"); *see also id.* at 18 (referencing a follow-up call by PSCC officers on October 20 to a "lady from Richmond," telling her they were waiting for Collins's transfer to be approved).  It is unclear what caused the delay in his transfer being effected, but his own allegations make clear that a transfer had been requested by PSCC weeks before he ever appealed to Punturi.

that a plaintiff assumes when asserting a claim of supervisory liability).

To adequately plead the first element, a plaintiff must allege "that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) (internal quotation marks omitted). With respect to the second element, "a plaintiff may establish deliberate indifference by demonstrating a supervisor's continued inaction in the face of documented widespread abuses." *Id.* (internal quotation marks omitted). Finally, as to the third element, "[c]ausation is established when the plaintiff demonstrates an affirmative causal link between the supervisor's inaction and the harm suffered by the plaintiff." *Shaw*, 13 F.3d at 799 (internal quotation marks omitted).

As noted, it is not even alleged that Punturi or Clarke actually received any letter or grievance from plaintiff. In short, the limited allegations against Punturi and Clarke do not reflect that they had knowledge of "documented widespread abuses" of the type referenced by Collins. Any supervisory claim thus fails.

### III.  CONCLUSION

For the foregoing reasons, Collins's complaint fails to state a claim against these two defendants and must be dismissed. An appropriate order will be entered.

Entered: June 21, 2023.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
United States District Judge

9